## HOLLAND HOME v CITY OF GRAND RAPIDS

Docket No. 187280. Submitted September 5, 1996, at Grand Rapids. Decided October 11, 1996, at 9:20 A.M.

Holland Home, a nonprofit association, petitioned the Michigan Tax Tribunal for a determination whether certain properties owned by the petitioner and located in the City of Grand Rapids were entitled to a property tax exemption for charitable use under MCL 211.7o; MSA 7.7(4l) for tax years 1991 and 1992. The Tax Tribunal found that the assessment of the taxes by the city was proper and denied the tax exemption sought by the petitioner. The petitioner appealed.

The Court of Appeals *held*:

1. The Tax Tribunal erred in requiring proof beyond a reasonable doubt of entitlement to a property tax exemption. The correct burden of proof for claiming membership in an exempt class is a preponderance of the evidence.

2. A property owner must satisfy the following requirements to qualify for a real property tax exemption: (1) the real estate must be owned and occupied by the exemption claimant, (2) the exemption claimant must be a library, benevolent, charitable, educational, or scientific institution, (3) the claimant must have been incorporated under the laws of this state, and (4) the exemption exists only when the buildings and other property thereon are occupied by the claimant solely for the purpose for which it was incorporated. Here, although the property was owned by the petitioner, part of it was not occupied on the relevant tax days. In addition, the tribunal correctly determined that the properties in question are not essential to, necessary to, or inextricable facets of the petitioner's charitable purpose.

3. The petitioner's continuing care plan does not qualify as a "gift," but instead is a contract between the petitioner and its residents that involves pecuniary consideration.

4. The tribunal's decision was based on competent, substantial, and material evidence on the record. The tribunal properly denied the property tax exemption sought by the petitioner.

Affirmed.

1. TAXATION — EXEMPTIONS — BURDEN OF PROOF.

A person seeking a tax exemption bears the burden of establishing beyond a reasonable doubt that the class of exemption claimed was intended by the Legislature, but must prove membership in the exempt class only by a preponderance of the evidence.

2. TAXATION — EXEMPTIONS — REAL PROPERTY.

Real property qualifies for exemption from taxation if: it is owned and occupied by the exemption claimant; the exemption claimant is a library, benevolent, charitable, educational, or scientific institution; the claimant is incorporated under the laws of this state; and the property is occupied by the claimant for the purposes for which it was incorporated.

3. TAXATION — EXEMPTIONS — NONPROFIT ORGANIZATIONS — CHARITABLE INSTITUTIONS.

"Charity" for purposes of a nonprofit organization seeking an exemption as a charitable institution from paying property taxes is a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works or otherwise lessening the burden of government (MCL 211.7o; MSA 7.7[4l]).

4. WORDS AND PHRASES — "GIFT."

A gift is a voluntary transfer of personal property without consideration, a voluntary conveyance of land, or transfer of goods, from one person to another, made gratuitously, and not upon consideration of blood or money.

*Mika, Meyers, Beckett & Jones, P.L.C.* (by *John M. DeVries* and *James F. Scales*), for the petitioner.

*Janice F. Bailey*, Assistant City Attorney, for the respondent.

Before: DOCTOROFF, C.J., and HOOD and NEFF, JJ.

PER CURIAM. Petitioner appeals as of right the Michigan Tax Tribunal's judgment denying it a property tax exemption for certain of its properties. We affirm.

This tax appeal arose from the tribunal's conclusion that certain of petitioner's properties were not entitled to a property tax exemption for charitable use under the General Property Tax Act, MCL 211.1 *et seq.*; MSA 7.1 *et seq.* Petitioner is a Michigan nonprofit association, based in Grand Rapids, that owns and operates the following facilities:

(1) Fulton Manor, located in Grand Rapids, consists of a unit that is a licensed home for the aged, a skilled care unit, a supportive care unit, and an Alzheimer's/dementia care unit. It serves a resident population of 445 persons.

(2) Brown Manor, located in Grand Rapids, offers thirty-five residents supportive care.

(3) Breton Manor, located in Kentwood, offers seventy-three residents skilled care.

(4) Raybrook Manor, located in Grand Rapids, consists of a unit that is a licensed home for the aged and a supportive care unit. It serves a total of 278 residents.

(5) Raybrook Manor Estates I (RME I) is physically connected with Raybrook Manor. It offers seventy-five independent care apartments· that housed 110 residents as of December 31, 1991.

(6) Raybrook Manor Estates II (RME II) is adjacent to RME I and Raybrook Manor. It was completed and occupied on December 31, 1992, and consists of 108 independent care apartments that housed seventy-five residents as of December 31, 1992.

Petitioner's state-licensed homes for the aged provide room, board, heat, electricity, water, and laundry facilities. They also have housekeeping services available and provide access to higher levels of care through petitioner's continuing care plan. The supportive care units provide the same services as offered in the homes for the aged, in addition to bedmaking, housekeeping, and personal services such

as assistance with grooming, dressing, mobility, and other daily activities. The Alzheimer/dementia unit provides supportive care facilities and specialized care designed to meet the special needs of the particular residents. The skilled care units offer supportive care services and twenty-four-hour skilled nursing care.

The independent living apartments are not state-licensed facilities. They are designed to accommodate the elderly who can live independently and who do not require active monitoring by petitioner's staff. The apartments permit residents to enjoy the privacy of living independently with the comfort of having certain services available on an as-needed basis. The services are available for an additional fee. The services include social activities, in-apartment dining, home-making/housekeeping, nursing care, home health aides, medical social workers, and physical, speech, and occupational therapists.

Under the continuing care plan, residents enter the facility most appropriate for that individual's physical and mental needs. As a resident's needs change, the resident may transfer between facilities providing greater or lesser levels of care. Through this program, petitioner promises to care for its residents for the remainder of their lives without regard for the resident's ability to pay.

Petitioner has provided elder care in the Grand Rapids area for more than one hundred years. To finance its operations, it relies on charitable contributions, resident payments, insurance programs, and governmental programs. Approximately four thousand people contribute a minimum of $15 and are considered members. The members do not receive

preferential treatment for admission to a facility or any other monetary benefit. Unpaid volunteer directors serve on petitioner's board of trustees, and petitioner does not attempt to influence legislation or provide financial or other support to political candidates.

Between 1987 and 1992, petitioner's annual deficit ranged from \$422,837 to \$1,700,186. During those same years, donations to petitioner ranged from \$503,384 to \$1,115,588. In addition to donations to cover operational deficits, petitioner has also received nearly \$2,000,000 in capital improvement donations, including \$117,500 for constructing RME I and \$1,071,000 for constructing RME II. Petitioner also received approximately 97,000 hours of volunteer services from 1990 to 1992. Without donations and volunteer service, petitioner could not continue its operations.

RME I was exempt from property taxes until December 31, 1990, when it was returned to the tax rolls. RME II was under construction on December 31, 1990, and December 31, 1991. Petitioner received the 1991 and 1992 property tax assessments for RME I and RME II, paid the taxes, and appealed those assessments to the Grand Rapids city assessor. Petitioner claimed that it was entitled to a tax exemption under § 7o of the General Property Tax Act, MCL 211.7o; MSA 7.7(4l). The assessor and the board of review denied the exemption. Petitioner then appealed to the tribunal, and that appeal was limited solely to whether RME I and RME II qualified for property tax exemptions for tax years 1991 and 1992.

On appeal before the tribunal, petitioner presented stipulated facts and argued that RME I and RME II were

charitable endeavors, either individually or as part of its entire operation, and in keeping with its purpose as a charitable institution. The stipulated facts referred to the entrance fees and monthly fees paid by residents. The entrance fees are lump sums paid upon admission, consisting of two parts: sixty-five percent is referred to as the refundable portion and thirty-five percent is referred to as the endowment portion. Under the agreement, a resident is entitled to a return of the refundable portion upon leaving RME I or RME II. The endowment portion is recognized as operating revenue over the average estimated remaining life of the resident. The monthly fee reimburses petitioner for maintenance and other similar costs, but does not meet the actual operating costs of RME I and RME II.

In 1990, the entrance fees for RME I ranged from $69,200 to $116,000 without a garage, and from $76,200 to $123,000 with an interior garage, and monthly fees were $160. In 1991, the entrance fees for RME I ranged from $72,700 to $121,000 without a garage, and from $80,100 to $129,200 with an interior garage, and monthly fees were $170. Before July 17, 1991, RME II entrance fees ranged from $79,400 to $180,800 with no parking space, and from $98,400 to $199,800 with two parking spaces. After July 17, 1991, entrance fees for RME II ranged from $87,300 to $198,900 with no parking space, and from $108,300 to $219,900 with two parking spaces. In 1992, monthly fees were increased to $200 a month.

Petitioner admits residents on a first-come, first-served basis; however, former employees receive preference. It also admits residents on a nondiscriminatory basis and requests only limited financial infor-

mation for billing purposes. Petitioner has never refused to admit a person because of an inability to pay either the entrance fees or the monthly fee. Petitioner granted four RME I residents partial waivers of entrance fees, totaling $51,900. If a resident's only asset consists of the refundable portion of the entrance fees, petitioner deducts the monthly fee from the refundable portion. When a resident exhausts all financial resources, including the refundable portion, the resident is required to apply for whatever public assistance the resident may be entitled to receive. Residents of RME I and RME II are not eligible for either Medicaid or supplemental security income benefits because these programs are designed for residents of licensed facilities.

Petitioner has never transferred a resident who could not pay fees to a different facility with lower rates unless one of three specific exceptions applied. When a resident's health necessitates a transfer to a facility offering more care, the transfer is made without payment of additional entrance fees. The resident, however, must pay the applicable board and care fees charged by the facility to which the resident is transferred. If a resident transfers and the resident has exhausted all other financial resources except the refundable portion of the entrance fees, the facility's charge is subtracted from the refundable portion. The refundable portion is thereby exhausted in one year to fourteen years, depending on the amount of the initial entrance fees paid and the level of care required. When the refundable portion is exhausted, residents must apply for whatever public assistance may be available.

As of December 31, 1991, three residents who entered RME I had exhausted their financial resources, leaving a shortage in the amount of $33,850 after Medicaid reimbursement. Of the four RME I residents who were granted partial waivers of the entrance fees, two still resided in RME I in 1992.

On appeal to the tribunal, respondent argued that, because petitioner had granted partial waivers to only Christian Reformed Church ministers or missionaries, or their spouses, petitioner did not benefit an indefinite number of persons or the general public. Respondent noted that no African-American or persons of the Jewish faith resided in RME I or RME II. Respondent further argued that many poor and minorities would be willing to accept petitioner's charity by moving into RME I and RME II. Respondent also argued that, because elderly residents are not entitled to a property tax exemption while living in their own homes, RME I and RME II residents, who live independently, should not be entitled to a property tax exemption.

The hearing officer's proposed opinion concluded that, because RME II was not fully constructed and occupied for use on the 1990 and 1991 tax days, it was not entitled to a property tax exemption. In the alternative, if RME II was occupied, its actual operation failed to satisfy the requirements for a property tax exemption pursuant to *Michigan Baptist Homes & Development Co v Ann Arbor*, 396 Mich 660; 242 NW2d 749 (1976), and *Retirement Homes of the Detroit Annual Conference of the United Methodist Church, Inc v Sylvan Twp*, 92 Mich App 560; 285 NW2d 375 (1979) (*Retirement Homes I*), which requires a benefit to the general public, a gift to an indefinite number of persons, or a lessening of gov-

ernment's burdens. The proposed judgment recommended denying petitioner the tax exemption on RME I and RME II.

Petitioner filed exceptions to the tribunal's proposed opinion and judgment, claiming several factual inaccuracies and an assignment of an incorrect burden of proof. The tribunal modified the hearing officer's proposed judgment to correct the tax identification numbers for RME I and RME II, noted the dispute over whether RME II was occupied and operational on the tax days at issue, and corrected the opinion to more accurately reflect the stipulated fact that petitioner never refused admission to a person who could not pay the fees.

The tribunal agreed that the correct burden of proof was proof beyond a reasonable doubt and concluded that RME II was not occupied on the relevant tax days. The tribunal rejected petitioner's argument that the continuing care plan bound petitioner to provide care to its residents even if those residents could not pay. The tribunal agreed with the hearing officer's conclusion that petitioner's minimal charity was insufficient. The tribunal indicated that petitioner provided a valuable service, noting, however, that the residents paid a "sizable cost" of between $72,000 and $194,000 for those services. The tribunal characterized the entrance fees and the monthly fee as "economic restrictions" on the general public that precluded an indefinite number of persons from enjoying the benefits of continuing care under petitioner's plan. The tribunal noted that there was no showing that petitioner actually provided the impoverished elderly with residences at RME I or RME II, despite the stipulation that petitioner had never refused to admit an individual

who could not pay. The tribunal concluded that there was no authority granting a tax exemption to a facility simply because it was nice. Nor did the tribunal find authority to grant a tax exemption without a showing that the facility offered charity without restriction and to an indefinite number of persons.

The pivotal issue on appeal is whether RME I and RME II are entitled to a tax exemption under MCL 211.7o; MSA 7.7(4l). In the absence of fraud, this Court reviews a decision of the Tax Tribunal to determine whether the tribunal erred in applying the law or adopted a wrong principle. *Saginaw General Hosp v Saginaw*, 208 Mich App 595, 597; 528 NW2d 805 (1995).

Petitioner first argues that the tribunal erred in requiring proof beyond a reasonable doubt of entitlement to a property tax exemption.[1] Petitioner relies on *Retirement Homes I, supra, Saginaw General Hosp, supra* at 598-601, and *Chauncey & Marion Deering McCormick Foundation v Wawatam Twp (After Remand)*, 196 Mich App 179, 182-189; 492 NW2d 751 (1992).

In *Retirement Homes I, supra* at 563, our Court addressed the petitioner's claim that the tribunal erred in requiring proof beyond a reasonable doubt that the petitioner's property qualified for a property tax exemption. The panel opined:

> A petitioner bears the burden of establishing beyond a reasonable doubt that the class of exemption claimed was intended by the Legislature. *Detroit v Detroit Commercial*

---

[1] Petitioner acknowledges that it bears the burden of proving beyond a reasonable doubt that the Legislature intended to exempt a class from paying property taxes, but petitioner asserts that it is required to prove its class membership by a preponderance of the evidence.

*College,* 322 Mich 142, 148-149; 33 NW2d 737 (1948). However, there is no language in the opinion which stands for the proposition that a petitioner must prove beyond a reasonable doubt that he is a member of an already exempt class.

\*          \*          \*

This act [§ 75 of the Administrative Procedures Act, MCL 24.275; MSA 3.560(175)] has been held to apply to the "quasi-judicial" proceedings of the Michigan Tax Tribunal. . . .

The proper standard should have been that of proof by a preponderance of the evidence rather than proof beyond a reasonable doubt.

Respondent relies on the Supreme Court's reversal of *Retirement Homes I, supra.* In *Retirement Homes of the Detroit Annual Conference of the United Methodist Church, Inc v Sylvan Twp,* 416 Mich 340; 330 NW2d 682 (1982) (*Retirement Homes II*), the Supreme Court reversed *Retirement Homes I,* in part, on unrelated grounds. The Supreme Court did not address the burden of proof issue. A decision by any panel of this Court is controlling precedent until a contrary result is reached by this Court or the Supreme Court takes other action. *People v Doyle,* 203 Mich App 294, 298; 512 NW2d 59 (1994), rev'd on other grounds 451 Mich 93; 545 NW2d 627 (1996); *Richardson v General Motors Corp,* 139 Mich App 727, 729-730; 363 NW2d 22 (1984); Administrative Order No. 1996-4. When the Supreme Court reversed *Retirement Homes I* on other grounds, it left intact this Court's conclusion in *Retirement Homes I* that the correct burden of proof for showing that a party is a class member is by a preponderance of the evidence. We therefore conclude that the tribunal erred

in concluding that the correct burden of proof was beyond a reasonable doubt.

Respondent argues that the standard of review is beyond a reasonable doubt pursuant to this Court's decision in *Michigan United Conservation Clubs v Lansing Twp*, 129 Mich App 1, 11; 342 NW2d 290 (1983) (*MUCC I*), modified 423 Mich 661; 378 NW2d 737 (1985) (*MUCC II*). In *MUCC I*, the petitioner argued that Const 1963, art 6, § 28 required competent, material, and substantial evidence on the whole record to prove its case. This Court noted that the petitioner had confused the standard of review with the burden of proof for claiming an exemption. *Id.* This Court, at 11, quoted the tribunal's decision approvingly, noting that it correctly stated the law:

> " '[I]t is a well-settled principle that, when a special privilege or exemption is claimed under a statute, charter or act of incorporation, it is to be construed strictly against the property owner and in favor of the public. This principle applies with peculiar force to a claim of exemption from taxation. Exemptions are never presumed, the burden is on a claimant to establish clearly his right to exemption, and an alleged grant of exemption will be strictly construed and cannot be made out by inference or implication but must be beyond reasonable doubt.' 2 Cooley, Taxation (4th ed), § 672, pp 1403-1404. See *Detroit v Detroit Commercial College*, 322 Mich 142, 148-149; 33 NW2d 737 (1948)." *Ladies Literary Club v Grand Rapids*, 409 Mich 748, 754; 298 NW2d 422 (1980).

Because the panel in *MUCC I* was not squarely presented with the same issue on appeal as the panel in *Retirement Homes I, supra*, the *MUCC I* decision does not necessarily conflict with this Court's decision in *Retirement Homes I*. Moreover, *Retirement Homes I* controls the resolution of this issue because

the issue in this case is identical to the question presented in *Retirement Homes I*, this Court specifically resolved that issue, and that issue was not overruled or modified by the Supreme Court.

Next, petitioner argues that the tribunal erred in interpreting the definition of charity too narrowly and concluding that RME I and RME II are not a part of petitioner's charitable and benevolent program under MCL 211.7o; MSA 7.7(4l). We disagree. In general, tax exemption statutes must be strictly construed in favor of the taxing authority. *Saginaw General Hosp, supra* at 598. However, this rule does not permit a strained construction adverse to the Legislature's intent. *Id.*

MCL 211.7o; MSA 7.7(4l) provides:

> Real estate or personal property owned and occupied by nonprofit charitable institutions incorporated under the laws of this state with the buildings and other property thereon while occupied by them solely for the purposes for which they were incorporated; and charitable homes of fraternal or secret societies and nonprofit corporations whose stock is wholly owned by religious or fraternal societies which own and operate facilities for the aged and chronically ill, in which the net income from the operation of the corporations does not inure to the benefit of any person other than the residents is exempt from taxation under this act.

To qualify for an exemption, a property owner must satisfy the following requirements:

> "(1) The real estate must be owned and occupied by the exemption claimant;
>
> "(2) The exemption claimant must be a library, benevolent, charitable, educational or scientific institution;
>
> "(3) The claimant must have been incorporated under the laws of this State;

"(4) The exemption exists only when the buildings and
other property thereon are occupied by the claimant solely
for the purposes for which it was incorporated." [*Ladies
Literary Club, supra* at 751, quoting *Engineering Society of
Detroit v Detroit*, 308 Mich 539, 550; 14 NW2d 79 (1944).]

With regard to requirement 1, there is no dispute
that petitioner owns the land on which the facilities
were built. There is, however, a dispute regarding
whether petitioner occupied RME II on the relevant tax
days. Petitioner contends that "a building need not be
fully constructed and filled with residents before it is
considered to be 'occupied' for purposes of tax
exemption," because constructing the building is as
much a part of its charitable mission as operating it.

Historically, § 7o has been construed to require
actual physical use. See, e.g., *Webb Academy v Grand
Rapids*, 209 Mich 523, 528; 177 NW 290 (1920). This
Court first adopted and addressed a quantum of use
test in *Lake Louise Christian Community v Hudson
Twp*, 10 Mich App 573; 159 NW2d 849 (1968). The
Court examined the use of land owned by the plain-
tiff, a religious and educational nonprofit corporation.
The Court was concerned with the frequency and
quantum of the use of the plaintiff's wooded parcels
for its stated purposes. The Court relied on the fol-
lowing criteria: (1) that the use was incidental or rela-
tive to the corporation's express purpose, and (2) that
the property was used frequently for that purpose. *Id.*
at 580.

This Court next considered, and rejected, the quan-
tum of use test in *Nat'l Music Camp v Green Lake
Twp*, 76 Mich App 608; 257 NW2d 188 (1977). The
Court expressly held that the quantum of use test did
not apply to educational organizations within the

scope of the statute. *Id.* at 611, n 1. The Court found that the quantum of use test was "stringent," "rigorous," and "extreme." *Id.* at 611. The Court instead concluded that the property was used "in a manner consistent with the nature of the land in such a way that the purpose for which the owning institution is exempt, education, was plainly advanced." *Id.* at 612.

The Court in *Kalamazoo Nature Center, Inc v Cooper Twp*, 104 Mich App 657; 305 NW2d 283 (1981), also examined the property owner's use of the property in an educational setting. The Court determined that the owner used the property in accordance with its stated purposes. The Court ultimately decided that physical use of the property was not a condition precedent to tax exemption and that the statute did not require actual physical use. *Id.* at 666. The Court added that the owner's use of the property was not occasional or de minimus. Given those circumstances, the Court stated that the quantum of use test was not a bar to the tax-exempt status of the property. *Id.* at 667.

More recently, in *Institute in Basic Life Principles, Inc v Watersmeet Twp (After Remand)*, 217 Mich App 7, 13; 551 NW2d 199 (1996), this Court adopted the criteria employed in *Nat'l Music Camp* and held that the quantum of use test should not be used to determine whether the property of a religious society qualifies for a tax exemption under the house of worship tax exemption statute. The proper test is whether the entire property was used in a manner consistent with the purposes of the owning institution. *Id.*

As the cases illustrate, this Court has permitted an exception to the general rule requiring actual, physi-

cal use to obtain a property tax exemption only in cases involving land held by an educational institution for ecological or environmental study purposes, and for houses of public worship. In each of the cases, the land at issue protects a habitat site and is being held in its natural state, or the land is currently being used in a manner consistent with the purposes of owning the institution. Petitioner's land, conversely, can hardly be described as being held in its natural state when petitioner admits that RME II was under construction on the relevant tax days. Nor was it being used in a manner consistent with owning the institution. We therefore find no error in the tribunal's conclusion that RME II was not occupied on the relevant tax days.

With regard to requirement 2, whether petitioner was a benevolent or charitable institution, charity is defined as follows:

> "[C]harity . . . [is] a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government." [*MUCC II, supra* at 671, quoting *Retirement Homes II, supra* at 348-349.]

Petitioner identifies its gift as the gift of continuing care to elderly persons who exhaust their financial resources. Petitioner promises not to evict a resident who can no longer pay for care as long as that resident has applied for whatever public assistance that person may be eligible to receive. On the basis of the factors identified in *Retirement Homes II, supra,* and

*Michigan Baptist Homes*, *supra*, the tribunal rejected petitioner's identified gift, finding that petitioner had not granted any complete waivers of its entrance fees, petitioner had granted only three partial waivers in 1987 totaling $51,900, and petitioner's service is provided at a sizable cost given that entrance fees for RME I and RME II range from $72,700 to $194,000.

We find that the tribunal reached the correct result, but for the wrong reason. This Court will not reverse a trial court's decision if the right result is reached for the wrong reason. *In re Powers*, 208 Mich App 582, 591; 528 NW2d 799 (1995). The critical point missed by the tribunal is that a contract is not a gift. Black's Law Dictionary (rev 4th ed, 1968), p 817, defines a gift as:

> A voluntary transfer of personal property without consideration. . . . A voluntary conveyance of land, or transfer of goods, from one person to another, made gratuitously, and not upon any consideration of blood or money. [Citations omitted.]

In this case, petitioner's continuing care plan is contained within the agreement between petitioner and its residents of RME I and RME II. The agreement is a contract because petitioner offers the resident a home and care under certain terms and conditions, the resident accepts the offer as extended, the resident pays the entrance fees and promises to pay the monthly fees, and petitioner promises to extend care even when the resident can no longer pay.

In addition, the continuing care plan is a legally enforceable, binding promise, imposing a duty on petitioner to provide its residents with care after the exhaustion of the residents' financial resources as

long as the residents have applied for the available public assistance. 1 Restatement Contracts, 2d, § 1. We therefore conclude that petitioner's continuing care plan cannot be a gift because a gift requires no pecuniary consideration.

Petitioner further argues that, pursuant to *Saginaw General Hosp, supra*, the tribunal erred in failing to recognize that RME I and RME II were inextricable facets of its charitable organization, which exist to aid the elderly by providing housing and care. In *Saginaw General Hosp*, this Court reversed because the tribunal failed to consider that the child care center advanced the hospital's overall mission. The child care center mitigated the hospital's staffing shortages that had been previously attributable to the staff's inability to find child care during the second or third shifts and child care that was available on short notice.

Courts must review an exemption claimant's articles of incorporation to determine the claimant's true purpose for owning and maintaining the property. *Gull Lake Bible Conference Ass'n v Ross Twp*, 351 Mich 269, 275; 88 NW2d 264 (1958). The relevant portion of petitioner's articles of incorporation provide:

> The purposes for which the corporation is organized are to own, provide, equip, conduct, maintain and operate, on Christian principles of benevolence and service to humanity, nursing and convalescent homes and homes for the elderly, for the care of persons who are aged or indigent or infirm, or have no satisfactory place in which to live, or are without means to provide for their support, and related purposes, but not for any purposes other than charitable and/or religious purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986 (or successor provision of similar import).

The tribunal's judgment opined that petitioner's

> RME I and RME II facilities were not shown to have operated
> for the charitable purpose of caring for those among the
> aged population who were "indigent or infirm, or [had] no
> satisfactory place in which to live, or [were] without means
> to provide for their support," in conformity with the corpo-
> ration's articles of incorporation . . . . There was no "gift"
> for an indefinite number of persons or for the benefit of the
> general public without restriction in the operation of the
> RME I and RME II apartments during the relevant tax years.

Therefore, the tribunal considered how RME I and
RME II fit within petitioner's overall charitable purpose
and found those facilities did not contribute to that
purpose. Furthermore, the stipulated facts do not
include a statement explaining that RME I and RME II
were necessary to, integral to, or an inextricable facet
of petitioner's charitable objectives. This is markedly
different from the stipulated facts in *Saginaw Hosp*
that explained the necessity of the child care center
at issue. In this case, the stipulated facts state only
that there were one thousand persons on the waiting
list for admission into petitioner's other facilities at
the time RME I was constructed, five hundred persons
on the waiting list for admission to petitioner's other
facilities at the time RME II was constructed, and RME I
and RME II were constructed to address the need for
additional housing for the elderly. From these facts, a
fair inference may be drawn that there was considera-
ble demand for petitioner's other facilities so that it
was not necessary for petitioner to construct RME I
and RME II to insure a steady stream of potential
patients to petitioner's other facilities.

Petitioner's decision to construct and operate RME I
and RME II did enable it to offer another choice in liv-

ing arrangements for the relatively healthy elderly, which may serve a useful, desirable purpose. However, it does not advance petitioner's charitable purpose of assisting the infirm elderly, the indigent elderly, or the elderly who have no satisfactory place to live. As the tribunal noted, not one resident's entrance fees were entirely waived, and only three RME I residents received partial waivers in 1987, totaling $51,900. The tribunal also noted that residents who exhaust their personal financial resources and become unable to pay their monthly fees have those fees deducted from the refundable portion. However, calculations based on the facts in this case show that it would take more than twenty-three years for an RME I resident to exhaust the refundable portion of the entrance fee, assuming that only the $160 monthly fee was deducted. It would take an RME II resident from nineteen to over fifty-three years to exhaust the refundable portion, depending on the unit's price and assuming a $200 monthly fee. These calculations support the inference that RME I and RME II residents are not indigent as long as they remain residents of RME I and RME II.

Additionally, the stipulated facts reveal that the residents must be mentally and physically capable of caring for themselves without active monitoring by petitioner's staff. Neither RME I nor RME II is a licensed care facility. The continuing care plan envisions transferring RME I and RME II residents who require higher levels of care to petitioner's other facilities. RME I and RME II residents do not qualify for Medicaid or supplemental security income benefits until they exhaust their personal financial resources and their refundable portion and have transferred to a licensed facil-

ity. These facts support the inference that RME I and RME II residents are relatively healthy and not infirm.

On the basis of the facts, we conclude that the tribunal correctly concluded that RME I and RME II are not essential to, necessary to, or inextricable facets of petitioner's charitable purpose. Furthermore, the tribunal's decision was based on competent, substantial, and material evidence from the record as a whole. *Saginaw General Hosp, supra* at 598, n 1.

It is undisputed that petitioner has satisfied requirement 3. The stipulated facts state that petitioner is incorporated under the laws of this state.

With regard to requirement 4, whether the building was occupied by the claimant solely for the purposes for which it was incorporated, we have previously concluded that, under requirement 1, the building was not occupied.

Affirmed.